IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN TANNENBAUM, M.D. | : | |
| | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| | : | |
| UNUM LIFE INSURANCE | : | NO. 03-CV-1410 |
| COMPANY OF AMERICA, et al. | : | |

**SURRICK, J.**                                                  **SEPTEMBER 15, 2006**

<u>**MEMORANDUM & ORDER**</u>

Presently before the Court is the Motion of Defendants Unum Life Insurance Company of America and UnumProvident Corporation ("Unum Defendants") For Dismissal And/Or Partial Summary Judgment (Doc. No. 34). For the following reasons, Unum Defendants' Motion For Partial Summary Judgment will be granted.

**I.     BACKGROUND**

From 1991 until 1996, Plaintiff Alan Tannenbaum, M.D., Dr. Gerard Margiotti, Jr., and Jane Winski were all employed by Holland Pediatrics, P.C. ("Holland"). In 1996, Holland was sold to Einstein Community Health Associates ("Einstein"). (Doc. No. 32 ¶ 28.) On or about September 13, 1991, Plaintiff purchased a long-term disability policy ("ID Policy") issued by Defendant Unum Life Insurance Company of America ("Unum Life"). Plaintiff purchased a second ID Policy from Unum Life on or about November 9, 1991. (*Id*. ¶¶ 22-23.) From 1991 through September 2001, Unum Life billed the premiums for Plaintiff's ID Policies as part of a FlexBill, which also included the premium charges for Margiotti and Winski. The FlexBill was sent to Holland from 1991 to 2001. As a pediatrician employed by Einstein, Plaintiff

also became a participant in Einstein's employee welfare benefits plan, which included short-term disability ("STD") and long-term disability ("LTD") policies.  (*Id.* ¶ 38.)

On December 1, 2000, Plaintiff was involved in a motor vehicle accident.  (*Id.* ¶ 41.)  As a result of the accident, Plaintiff suffered serious personal injuries, which required surgery.  In January 2001, Plaintiff returned to his work as a pediatrician at Einstein while he continued to receive treatment and physical therapy.  (*Id.* ¶¶ 41-45.)  On or about April 1, 2002, Plaintiff determined that he could no longer perform his duties in a professional manner, and he ceased working as a pediatrician.  (*Id.* ¶ 48.)  On or about June 6, 2002, Plaintiff applied for benefits under his STD, LTD, and ID Policies.  (*Id.* ¶ 50.)

Plaintiff filed this lawsuit against Defendants seeking relief pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 28 U.S.C. § 1001, and Pennsylvania state law.  Plaintiff alleges that Defendants failed to pay him certain disability benefits that he was due under his STD, LTD, and ID Policies.  (*Id.* ¶¶ 88-112.)  In their Motion, Unum Defendants seek dismissal of the state law claims alleged in Counts IV, V, VI, and VII of Plaintiff's Third Amended Complaint.[1]  Unum Defendants contend that these state law causes of action are preempted by ERISA.[2]  (Doc. No. 34.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

---

[1] Count IV alleges Breach of Contract.  Count V alleges Breach of Covenant of Utmost Fair Dealing.  Count VI alleges Bad Faith pursuant to 42 Pa. Cons. Stat. §8371.  Count VII alleges violation of the Unfair Trade Practices and Consumer Protection Law.

[2] At issue in this Motion are the ID Policies and the application of ERISA to those policies.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).[3]  A genuine issue of material fact exists only when "the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The party moving for summary

judgment bears the initial burden of demonstrating that there are no facts supporting the

nonmoving party's legal position.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once

the moving party carries this initial burden, the nonmoving party must set forth specific facts

showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see also Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (explaining that the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts").

"The nonmoving party . . . 'cannot rely merely upon bare assertions, conclusory allegations or

suspicion' to support its claim."  *Townes v. City of Phila*., Civ. A. No. 00-CV-138, 2001 U.S.

Dist. LEXIS 6056, at *4 (E.D. Pa. May 11, 2001) (quoting *Fireman's Ins. Co. v. DeFresne*, 676

F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing summary judgment must go beyond

the pleadings and present evidence through affidavits, depositions, or admissions on file to show

that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  When deciding a motion for

summary judgment, the court must view facts and inferences in the light most favorable to the

---

[3] Although Unum Defendants have indicated that their Motion seeks dismissal pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56, (Mot., Doc. No. 34 at 1), they offer only the standard for summary judgment in their brief in support of the Motion.  (Br., Doc. No. 34 at 2-3.) The issue of ERISA preemption is fact-intensive by nature, *see Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992), and both parties have submitted numerous exhibits and deposition transcripts in support of their arguments.  We will treat Unum Defendants' Motion as a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c).

nonmoving party.  *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54

F.3d 1125, 1127 (3d Cir. 1995).  However, we do not resolve factual disputes or make credibility

determinations.  *Siegel Transfer*, 54 F.3d at 1127.

## III.    LEGAL ANALYSIS

In their Motion, Unum Defendants contend that Plaintiff's ID Policies are part of an

employee welfare benefit program established and maintained by his employer and thus, are

governed by ERISA.  (Doc. No. 34 ¶ 66.)  ERISA "is a comprehensive statute that subjects a

wide variety of employee benefit plans to complex and far-reaching rules designed to protect the

integrity of those plans and the expectations of their participants and beneficiaries."  *Weinstein v.*

*Paul Revere Ins. Co.*, 15 F. Supp. 2d 552, 556 (D.N.J. 1998) (internal quotations omitted).  "To

assure uniform treatment, Congress provided that where a plan is covered by ERISA, all state

laws relating to the plan are preempted."  *Brown v. The Paul Revere Life Ins. Co.*, No. Civ. A.

01-1931, 2002 WL 1019021, at *5 (E.D. Pa. May 20, 2002); *see Dukes v. U.S. Healthcare, Inc.*,

57 F.3d 350, 354 (3d Cir. 1995) ("The Supreme Court has determined that Congress intended the

complete-preemption doctrine to apply to state law causes of action which fit within the scope of

ERISA's civil-enforcement provisions." (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66

(1987)).  If ERISA preemption is applicable to the ID Policies, then the state law claims in

Counts IV, V, VI, and VII of the Third Amended Complaint must be dismissed.  Because

preemption is an affirmative defense, the burden is on Unum Defendants "to assert its

application to any given plan."  *Brown*, 2002 WL 1019021, at *5.

### A.    Plan Under ERISA

ERISA applies to "any employee benefit plan if it is established or maintained . . . by any

employer engaged in commerce." *Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting 29 U.S.C. § 1003(a)).  Pursuant to the definition provided in 29 U.S.C. § 1002(1), an employee welfare plan requires:

> (1) a "plan, fund, or program" (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

*Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982).  As the Third Circuit has advised, in our analysis of whether the ID Policies are governed by ERISA, "we will keep in mind the intent of Congress 'that coverage under [ERISA] be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs.'" *Deibler*, 973 F.2d at 209 n.5 (quoting S. Rep. No. 93-127 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4854).  "The existence of an ERISA plan is a question of fact, to be answered in the light of all the surrounding circumstances from the point of view of a reasonable person." *Schneider v. UNUM Life Ins. Co. of Am.*, 149 F. Supp. 2d 169, 175 (E.D. Pa. 2001) (internal citation omitted).

Here, it is not disputed that the ID Policies provided disability benefits to Plaintiff, the participant, thus satisfying prongs (4) and (5) of the definition of an employee welfare plan. Plaintiff contends that the ID Policies do not constitute plans established or maintained by Plaintiff's employer, and therefore do not satisfy the requirements of prongs (1), (2), and (3). We will address each of these issues in turn.

1.    Plan, Fund, or Program

"[A] 'plan, fund or program' under ERISA is established if from the surrounding

5

circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Deibler*, 973 F.2d at 209; *see also Stone v. Disability Mgmt. Servs., Inc.*, 288 F. Supp. 2d 684, 688 (M.D. Pa. 2003).

        a.     <u>Intended Benefits</u>

      The ID Policies state that they provide "disability income benefits under stated conditions." (Doc. No. 1 at Exs. 1, 2.) The Policies outline in detail the types of disability benefits.[4] (*Id.*) Plaintiff argues that other Holland employees, Dr. Gerard Margiotti, Jr. and Jane Winski, bought either one or two ID Policies and that these employees were free to select the amount and type of disability coverage. (Doc. No. 42 at 7.) However, the number of Policies purchased and the flexibility in tailoring those Policies to an individual employee's needs have no impact on the intended benefit—disability coverage—of the Policies. Indeed, Plaintiff makes no reference to the substance of those Policies, and he does not appear to seriously argue that the intended benefits of any one of those ID Policies were substantially different than the benefits of the other Policies. Accordingly, we conclude that a reasonable person could readily ascertain that disability coverage for the enrolled employees was the intended benefit of these Policies. *See Weinstein*, 15 F. Supp. 2d at 557.

---

     [4] Courts have concluded that a reasonable person can ascertain the intended benefits where, as here, the policy describes these benefits. *See, e.g.*, *Randol v. Mid-West Nat. Life Ins. Co. of Tenn.*, 987 F.2d 1547, 1550 (11th Cir. 1993) ("The intended benefits are, of course, the medical care provided under the insurance policy."); *Tilton v. Radiation Oncologists*, 409 F. Supp. 2d 560, 565 (D. Del. 2006) (benefit of plan set out where plan stated that its purpose was to "provide a deferred compensation benefit to the Employee upon his retirement"); *Cronin v. Zurich Am. Ins. Co.*, 189 F. Supp. 2d 29, 34 (S.D.N.Y. 2002) (intended benefits were "entirely clear" from summary plan descriptions and language of the policies themselves); *Zimnoch v. ITT Hartford*, Civ. A. No. 99-6594, 2000 WL 283845, at *4 (E.D. Pa. 2000) (concluding that, after reviewing portions of the policy, a reasonable person could "readily determine" that the policy covered long term disability benefits).

b.      Class of Beneficiaries

Unum Defendants contend that the class of beneficiaries for the ID Policies is clear,

because that class was comprised of Plaintiff and Marigotti, employees and shareholders of

Holland, and Jane Winski, Holland's bookkeeper and office manager.  (Doc. No. 34 at 6-7.)

Plaintiff disputes this conclusion, however, and argues that no other employees were included on

the FlexBill arrangement for the ID Policies.  (Doc. No. 42 at 5.)  In support of this argument,

Plaintiff cites *Stone v. Disability Management Services, Inc.*, 288 F. Supp. 2d 684 (M.D. Pa.

2003), for the proposition that "all shareholders, not just a few" should be included in a policy in

order to have a reasonably discernable class of beneficiaries.[5]  (Doc. No. 42 at 6 n.9.)  Unum

Defendants point out, however, that all of the shareholders *were* included in the ID Policy and

the FlexBill, because Plaintiff and Dr. Margiotti were the only two shareholders of Holland.

(Doc. No. 43 at 5; Pl. Dep. at 22-23).  Moreover, we note that the requirement of a class of

beneficiaries "may be satisfied even where there is only one employee participating in the plan."

*Grimo v. Blue Cross & Blue Shield of Vt.*, 899 F. Supp. 196, 202 n.6 (D. Vt. 1995); *see also*

*Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1376 (7th Cir. 1997) (concluding that "as long as the

benefits program meets the other requirements of an ERISA plan . . . the program does not fall

outside the ambit of ERISA merely because it covers only a single employee"), *abrogated on*

*other grounds by Int'l Union of Operating Eng'rs v. Rabine*, 161 F.3d 427 (7th Cir. 1998);

*Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) ("a plan covering only a single

---

[5] In fact, the *Stone* court made no such statement.  It merely concluded that, because all three shareholders of the employer received the same disability policy, a reasonable person "could easily conclude" that the class of beneficiaries of the policy at issue was the shareholders of the employer.  *Stone*, 288 F. Supp. 2d at 689.

employee, where all other requirements are met, is covered by ERISA"); *Cecil v. AAA Mid-Atl., Inc.*, 118 F. Supp. 2d 659, 665 (D. Md. 2000) (one employee constitutes class of beneficiaries). In this case, it is clear that the class of beneficiaries is comprised of those Holland employees who had signed up for the ID Policies.

Plaintiff argues that another physician, Dr. Vera Frumin-Eisenberg, was at one time also on the FlexBill for an ID Policy but was "never a Holland Pediatrics' employee." (Doc. No. 42 at 5-6.) According to Plaintiff, this evidences a lack of any discernable class of beneficiaries, because Dr. Frumin-Eisenberg had "no economic relationship with Holland Pediatrics at the time she joined in the same FlexBill[,] . . . received the same percentage discount," and "was added by the insurer to the FlexBill without any input or participation by Holland Pediatrics." (*Id.*) There does not appear to be any dispute that Frumin-Eisenberg, while not an employee, worked as an independent contractor for Holland. (Frumin-Eisenberg Aff. ¶¶ 3, 6.) According to Frumin-Eisenberg's affidavit, she was added to the FlexBill three months after her contractual services ended with Holland and remained on the FlexBill for approximately two months. (*Id.* ¶¶ 9-11.) We are satisfied that the circumstances surrounding Frumin-Eisenberg do not preclude the existence of a discernable class of beneficiaries. Indeed, according to Frumin-Eisenberg's statements, this may have been an accounting irregularity, as evidenced by the fact that she was removed from the FlexBill at the end of the next Unum Life quarterly FlexBill cycle.[6] (*Id.* ¶ 11.)

---

[6] In her declaration, Anna Stein, the assistant vice president in the customer service center at Unum Life, stated: "From all of the information I have reviewed to date, I see no indication that Unum Life had any indication that Dr. Frumin-Eisenberg's relationship with Holland Pediatrics, P.C. had ended or ceased before the time she was added to the FlexBill plan." (Mar. 28, 2006 Stein Decl. ¶ 7.) She further averred that "Unum Life would not have allowed Dr. Frumin-Eisenberg to be added to the Holland Pediatrics, P.C. FlexBill plan unless it had believed, perhaps erroneously assuming her affidavit is accepted, that she had a current

8

We conclude that a reasonable person would understand that the enrolled employees comprise the class of beneficiaries.

          c.    <u>Source of Financing</u>

Plaintiff admits that Holland paid the premiums for Plaintiff, Margiotti, and Winski from 1991 until 1996.  (Doc. No. 42 at 7-8.)  The payments were remitted on Holland's checks, which were drawn from Holland's bank account.  (Winski Dep. 376-77; Winski Decl. ¶ 13.)  Plaintiff does not contest that the bills for the ID Policy premiums were sent directly to Holland from 1991 until 2001, and that even after the sale to Einstein, the FlexBill for these individuals was sent to Holland's attention.  (Winski Decl. ¶¶ 16-17, 23-24; May 26, 2005 Stein Decl. ¶ 4.)  Plaintiff argues that Holland was repaid for these premium payments by these individuals on a regular basis and that after Holland was sold to Einstein in 1996, all three individuals paid their premiums with personal checks.  (Doc. No. 42 at 7-8; Doc. No. 41 at Ex. 11.)  Plaintiff contends that he paid all premiums for his ID Policies with his own, after-tax dollars and that to the extent that Holland paid the premiums, such advances were loans which were repaid in full by Plaintiff. (Doc. No. 32 ¶ 34.)

For a plan to exist, the source of funding must be identifiable.  "The source of funding may be the employer, the employee, or a combination of both."  *Grimo*, 899 F. Supp. at 202 (citing *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 242-43 (5th Cir. 1990); *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 977-78 (5th Cir. 1991); *Madonia v. Blue Cross & Blue Shield of Va.*, 11 F.3d 444, 446-47 (4th Cir. 1993)).  In *Grimo*, a case factually similar to the

---

economic relationship with Holland Pediatrics, P.C. during the time period in question."  (*Id.* ¶ 9.)

instant case, during part of the relevant time period, some employees paid their own premiums while the employer paid the premiums for other employees.  During other years, the employer shared the cost of premiums with the plaintiff and the shareholders.  *Id.*  The district court concluded that "a reasonable person would understand that the source of financing was either the employer, the employee, or both, depending on the year and the individual," thus satisfying the source element.  *Id.*  The court observed that the parties disputed the nature and significance of the contribution to the premium payments made by the employer and by the employees.  The insurer claimed that the employer paid a varying percentage of plaintiff's premiums for a number of years, and the employer insisted that it never contributed to its employees' premium payments.  *Id.* at n.8.  The court noted that this dispute was irrelevant to the analysis, however, "because all that is required is that the source of financing be identifiable."  *Id.* (citing *Donovan*, 688 F.2d at 1373).  The record in this case indicates that the source of financing was in part the employer, Holland, and in part the enrolled employee.  Even when we interpret all of the facts in a light most favorable to Plaintiff, we conclude that the source of financing is readily identifiable.

#### d.    Procedures for Receiving Benefits

Finally, Plaintiff does not dispute the fact that the ID Policies outline the procedures for receiving benefits.  Accordingly, all of the requirements for a plan under ERISA have been established.  We conclude that a plan exists.

### 2.    Established or Maintained by an Employer

Next we must determine whether the employer, Holland, established or maintained the plan.  "A significant consideration is whether the employer intended to provide benefits on a

10

regular and long-term basis." *Weinstein*, 15 F. Supp. 2d at 558.  "[N]o single act in itself necessarily constitutes the establishment of the plan, fund, or program." *Donovan*, 688 F.2d at 1373.

For guidance on this issue, we look to cases decided in this Circuit.  The case of *Brown v. The Paul Revere Life Insurance Co.* is instructive.  In *Brown*, the district court noted that "[t]he purchase of insurance by an employer is strong, if not conclusive, evidence that the employer has established or maintained the plan under ERISA." *Brown*, 2002 WL 1019021, at *5 (citations omitted); *see also Weinstein*, 15 F. Supp. 2d at 558.  The insurance policy at issue in *Brown* was one of the benefits that the company offered its employees.  *Brown*, 2002 WL 1019021, at *5. The employer in *Brown* paid for its employees' insurance premiums through its employees' bonus deductions.  *Id*.  The employer was sent one bill listing the premiums owed for all employees, with a premium discount of fifteen percent to each policyholder.  *Id.* at *3.  The court found that the employees were able to obtain insurance coverage at a lower cost, through tax benefits and the discount, and concluded that the employer had "established or maintained this plan to benefit its employees." *Id.* at *5.  Here, Holland offered three of its employees, including its two shareholders, the opportunity to purchase disability insurance, in addition to the other benefits it offered its employees.  The ID Policy invoices were sent directly to Holland, and Holland paid the ID Policy premiums for its employees on a check from Holland's bank account. These amounts were usually repaid by the employees, either by bonus deductions or by an employee's personal check.  (Winski Dep. at 214-16; Pl. Dep. at 150-51.)  The Holland employees were also able to take advantage of a fifteen percent discount for their ID Policy premiums by obtaining the Policies through Holland.

11

In *Stone*, the district court focused on the employer's involvement in the administration of the plan to ascertain whether the plan had been established or maintained by the employer. *See Stone*, 288 F. Supp. 2d at 690 (citing *Hansen*, 940 F.2d at 978); *see also Grimo*, 899 F. Supp. at 205 ("Employer involvement with the administration of the plan indicates that an ERISA plan has been established."). The employer in *Stone* had its insurance agent assist the applicants with their disability policy and coverage questions and completed their applications for the policies by meeting with the individuals to collect the relevant information. *Stone*, 288 F. Supp. 2d at 690-91. The court found that the agent had acted "more or less, like an intermediary" between the insurer and the employer. *Id.* at 690; *see also Weinstein*, 15 F. Supp. 2d at 558 (company that had provided an insurance broker, who acted as intermediary between company and disability carrier, had "assumed a role in the ongoing administration of the Policy"). The employer also received the policy statement bill and remitted payment for the shareholders' policies each month. *Stone*, 288 F. Supp. 2d at 691. The court in *Stone* concluded that the employer had established or maintained a plan under ERISA. *Id.* In the case at bar, Holland employed Michael Amato and his firm, Independent Tax & Financial Planners, P.C., to act as its accountant and insurance advisor. Amato testified that his firm assisted with the purchase of the ID Policies for Plaintiff, Margiotti, and Winski.[7] (Amato Decl. ¶¶ 5,14.) Amato provided

---

[7] We note that there are some discrepancies regarding the billing information supplied on one of Plaintiff's ID Policy applications. On both of Plaintiff's ID Policy applications on file with Amato's office, the section entitled "Who Will Pay The Premiums?" has been filled out to indicate "Proposed Insured." The section entitled "Send Premium Notices To" has been filled out to indicate "Business." (Amato Dep. at 96-113; Amato Decl. ¶¶ 6-13; Doc. No. 32 at Exs. 3, 4.) According to Anna Stein, the insurer's copy of Plaintiff's second ID Policy application indicates that the employer, not the proposed insured, was to be billed at the business address. (May 26, 2005 Stein Decl. ¶ 3.) Unum Defendants do not appear to dispute that Plaintiff's initial application indicated he was to be billed at his place of business. Unum Defendants contend that

Holland with insurance advice regarding individual disability and life insurance.  (Amato Dep. at 34-35.)  Frank Rich, Amato's predecessor, had received a commission from Unum Life for obtaining the ID Policies on Holland's behalf, and Amato may have received a commission as well once the ID Policies were reassigned to him as the insurance agent.  (*Id.* at 38-42.)  Jane Winski indicated that, if needed, she could ask Amato questions regarding her ID Policies.  (Winski Dep. at 191.)  Amato corresponded with Unum Life regarding Plaintiff's ID Policy and instructed Winski to advise Unum Life to change how the premiums on Holland's FlexBill were listed.  (Winski Dep. at 389-93; Amato Dep. at 196-99.)

Considering all of the evidence, we conclude that Amato and his firm acted as an intermediary between Holland and Unum Life.  We also conclude, as did the courts in *Stone*, *Weinstein*, and *Brown*, that Holland established or maintained a plan under ERISA.  *See also Keenan v. Unum Provident Corp.*, 252 F. Supp. 2d 163, 167 (E.D. Pa. 2003) (plan established or maintained by employer where plaintiff's premium notice lists employer and has employer's address as plaintiff's billing address).

**B.      "Safe Harbor" Provision**

Having found that a plan exists, we must determine whether the ID Policies fall within ERISA's safe harbor provision and are, therefore, not governed by ERISA.  The Department of Labor promulgated regulations in order "to clarify the definition of the terms 'employee welfare benefit plan' and 'welfare plan' . . . by identifying certain practices which do not constitute

---

the information on the disputed application "is not critical for resolving the instant Motion for Summary Judgment . . . ."  (Doc. No. 34 at 7 n.4.)  We agree.  The discrepancies regarding Plaintiff's policy applications do not change our analysis in the determination of ERISA applicability.

employee welfare benefit plans for those purposes."  29 C.F.R. § 2510.3-1(a).

A plan is not an employee welfare benefit plan when:

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees or members;

(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).  "All four factors must be met for a plan to fall within the regulation's safe harbor."  *Weinstein*, 15 F. Supp. 2d at 557.  Unum Defendants contend that the ID Policies fail the first and third prongs of the test.

1.    Employer Contributions

Courts in this Circuit have concluded that a discount on an insurance policy premium constitutes an employer contribution.  In *Brown*, the court noted that "[w]here an employer provides its employees benefits they can not receive as individuals, it has contributed to an ERISA plan."  *Brown*, 2002 WL 1019021 at *7 (citing, *inter alia*, 26 C.F.R. § 54.4980B-2 (Department of Treasury COBRA regulation stating that "a group health plan is maintained by an employer . . . even if the employer does not contribute to it if coverage under the plan would not be available at the same cost to an individual but for the individual's employment-related connection to the employer or employee organization")).  The *Brown* court determined that a fifteen percent discount was available to the plaintiff "only because he bought insurance together

14

with other employees" of the company and that he received a tax benefit only because of the way in which the company organized its bonuses. *Id.* But for his status as an employee, "the premium payments on the Policy would have been higher in absolute terms and would have been payable with taxable income." *Id.* Thus, the employer had made a contribution to the policy "by providing [plaintiff] a benefit he could not have received as a non-employee." *Id.* at *8. The court in *Stone* came to the same conclusion in a factual situation strikingly similar to the one at issue here. In *Stone*, the plaintiff and other shareholders received a ten percent discount on their disability policy premiums, and that discount was only available because three employees from the company were grouped together on one statement. *Stone*, 288 F. Supp. 2d at 692. The court noted that the invoice had to be billed through the employer, and the employees were aware that they would receive a discount. *Id.* Moreover, the employer paid the premiums on each of the shareholder's policies, giving the shareholders "interest and term free monthly loans," which the shareholders "were free to pay back . . . at their leisure." *Id*; *see id.* at 690 n.2 (indicating that the plaintiff did not have a fixed repayment schedule, and the balance owed to the company carried over from year to year); *Madonia*, 11 F.3d at 447 (ERISA plan exists where, *inter alia*, employer provided employee with interest-free loan and salary increase so that she could pay for her insurance premiums). The court concluded that the loans alone "clearly amount[ed] to a contribution to the plan." *Stone*, 288 F. Supp. 2d at 692. As such, the employer had made a contribution to the disability insurance "by providing the plaintiff a benefit he could not have received as a non-employee." *Id.* Other courts have reached the same conclusion where discounted premiums were involved. *See Halprin v. Equitable Life Assurance Soc'y*, 267 F. Supp. 2d 1030, 1037 (D. Colo. 2003) (employer's negotiation of terms and discounted rates of

policy constituted contribution); *Keuhl v. Provident Life & Accident Ins.*, Civ. No. 97-C-1021,

2000 U.S. Dist. LEXIS 21625, at *12-13 (E.D. Wis. Apr. 20, 2000) (participation of three

employees and resulting ten percent premium discount constitutes evidence of employer

contributions to the overall plan).

All three Holland employees who signed up for the ID Policy were aware that they

received a discounted premium.  (Pl. Dep. at 69-70; Winski Dep. at 298.)  Winski testified that

the only purpose that she knew of for grouping the ID Policies together was to obtain the fifteen

percent discount.  (Winski Dep. at 298.)  Plaintiff testified that while the discount was not a

factor in his decision to apply for the ID Policies, he believed Margiotti "appreciated" the

discount.  (Pl. Dep. at 69-70.)  As mentioned above, the ID Policy bill was sent directly to

Holland, which then paid the premiums on behalf of Winski, Margiotti, and Plaintiff on a

quarterly basis.  According to Holland's bookkeeping records, the payments for the ID Policy

premiums were listed as loan receivables for Winski, Margiotti, and Plaintiff.[8]  (Winski Dep. at

273; 293-94; Doc. No. 41 at Ex. 9.)  It appears that while the three Holland employees usually

repaid Holland the amount of the premiums, this was not always the case.  From 1991 to 1996,

Plaintiff and Margiotti repaid Holland for the payments Holland had remitted to Unum Life on

their behalf.[9]  (Amato Decl. ¶ 41.)  However, the evidence is lacking regarding how Plaintiff and

---

[8] In September 1991, the first premium payment to Unum Life was listed as "insurance other" in Holland's books.  (Amato Dep. at 132-33; Doc. No. 41 at Ex. 9.)  Amato testified, however, that this was an error that was corrected in early 1992, at which point the Unum Life premium payment was listed as a "loan receivable."  (Amato Dep. at 133-35.)

[9] It is unclear how these individuals remitted payments to Holland.  Winski testified that she would collect checks from Margiotti and Plaintiff in the amount of their respective premiums and use these to pay back Holland.  (Winski Dep. at 214-16.)  However, Plaintiff believes that he paid for his portion of the premiums through bonuses while he was employed by Holland.  (Pl.

Margiotti paid for their premiums in 1996.  According to Amato, there is no documentation

"establishing with specificity how Dr. Tannenbaum and Dr. Margiotti decided to handle their

respective shares of the Unum policy premium loan receivable for that year."  (Amato Decl. ¶

38.)  In addition, there is no indication that Winski ever repaid Holland for her premiums in 1995

and 1996.  (Amato Dep. at 91, 166; Amato Decl. at ¶¶ 37, 42, 43.)  In fact, Winski did not view

the premiums as something she had to pay for out of her own pocket and did not believe it would

cost her any money.  (Doc. No. 34 at 7; Winski Dep. at 95-99, 184-85, 305-06; Winski Decl. ¶

12).  Amato contends that Holland's payroll records from 1991 to 1994 indicate that Winski

repaid Holland for her disability insurance premium.  (Amato Decl. ¶ 42.)  According to an

employee of Unum Life, after Einstein purchased Holland, the ID Policy premiums continued to

be paid by Holland until 2001.  (May 26, 2005 Stein Decl. ¶¶ 4, 6; Winski Decl. ¶¶ 23-24.)

Plaintiff contends that he paid Unum Life directly for his ID Policy premiums after Holland was

sold. (Doc. No. 42 at 7-8; Doc. No. 41 at Ex. 11.)  It is not disputed that the ID Policy FlexBill

was sent to the attention of Holland until 2001, well after the sale of Holland's business to

Einstein, and that Plaintiff continued to receive a discount on his premium until 2001.  (Winski

Decl. ¶ 23; May 26, 2005 Stein Decl. ¶¶ 4, 5.))  Unum Life was not notified of the sale of

Holland to Einstein or that Holland ceased to be an operating business.  (Winski Decl. ¶ 23;

Stein Dep. at 118-20.)  At some point after Einstein purchased Holland, the three former Holland

employees paid Unum Life directly for their premiums, but they continued to receive the fifteen

percent discount until 2001, at which time Amato requested Unum Life to discontinue the

FlexBill arrangement.  (Winski Dep. at 206; Pl. Dep. at 132-34; Amato Dep. at 198-99; May 26,

---

Dep. at 150-51.)

2005 Stein Decl. ¶ 7.)

In addition, Plaintiff concedes that there were no terms or interest on monies he owed Holland for paying his Unum Life premiums.  (Pl. Dep. at 53-54.)  It does not appear from the record that Plaintiff or Margiotti were required to repay Holland on any kind of schedule.  *See Stone*, 288 F. Supp. 2d at 692.  Moreover, it is clear that Plaintiff would not have received the benefit of the fifteen percent discount or the interest-free and term-free loans had he not been a shareholder and employee of Holland.  We therefore conclude that Holland contributed to the ID Policy plan.

2.    <u>Employer Neutrality</u>

Because we have concluded that Holland made contributions to the ID Policies, the first prong of the safe harbor provision has not been met.  Therefore, the safe harbor provision cannot apply and the ID Policies are governed by ERISA.

**C.    Application of ERISA After Einstein's Purchase of Holland**

The parties disagree as to whether ERISA should continue to apply to Plaintiff's ID Policies after the FlexBill was discontinued.  Unum Defendants argue that the ID Policies still constitute ERISA-covered plans even though Plaintiff was no longer employed by Holland after it was sold to Einstein in 1996.  (Doc. No. 34 at 25-26.)  Plaintiff argues that his Policies were "converted" sometime after the sale of Holland and, as such, are not governed by ERISA.  (Doc. No. 42 at 29.)  Plaintiff's argument is without merit.  Initially, as has been discussed above, the record indicates that the ID Policy bills were sent to Holland even after the sale to Einstein, and Plaintiff received a discount premium due to the FlexBill arrangement with the other Holland employees.  At some point after the sale of Holland, Plaintiff submitted payment directly to

Unum Life, although the parties disagree about when this occurred.  Plaintiff contends that he submitted payment as early as 1997, while a Unum Life employee stated that Holland submitted payments for Plaintiff's ID Policy premiums through 2001.  (Doc. No. 42 at 7-8; Doc. No. 41 at Ex. 11; May 26, 2005 Stein Decl. ¶ 4.)  It was not until 2001, after Plaintiff's accident and approximately five years after the sale of Holland, that the FlexBill was discontinued and Plaintiff received an individual bill from Unum Life without the discount on his premiums. Under the circumstances, we conclude that ERISA applies to Plaintiff's claim, regardless of when Plaintiff began to pay Unum Life directly.  Our conclusion finds support in *Brown*, where the court rejected the same argument made by Plaintiff here.  In *Brown*, as in this case, the plaintiff paid premiums on his policy after the company had dissolved.  The plaintiff argued that the disputed policy had converted even though there was no express conversion right.  *Brown*, 2002 WL 1019021, at *8.  The court observed that some courts, not in the Third Circuit, "have held that a policy once governed by ERISA may be 'converted' to a non-ERISA policy if an employee who has left a company explicitly exercises a contractual right to 'convert' to an individual plan." *Id.* (citing *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872 (9th Cir. 2001); *Demars v. CIGNA Corp.*, 173 F.3d 443 (1st Cir. 1999); *Chami v. Provident & Accident Ins. Co.*, No. 3:01-CV-370, 2002 U.S. Dist LEXIS 2528 (N.D. Ind. Feb. 5, 2002); *Mimbs v. Commercial Life Ins. Co.*, 818 F. Supp. 1556 (S.D. Ga. 1993)).  Unum Defendants point out that Plaintiff's ID Policies do not provide conversion rights.  Plaintiff does not argue otherwise. (Doc. No. 43 at 28.)  Moreover, "[e]ven if conversion rights were recognized, no court has ruled that a plaintiff who does not convert, but simply continues to pay as an individual when his employer becomes defunct, has removed his policy from ERISA coverage." *Id.*  The *Brown*

19

court concluded that because the plaintiff continued to receive discounts on his policy and did

not notify the insurer that he was no longer employed by his company, he could not avoid

preemption.  *Id.* at *9.  It appears that Unum Life was not notified that Holland had ceased to

operate as an on-going business, or that Plaintiff was no longer an employee of Holland, until

September 2001.  (Stein Dep. at 118-20.)  Unum Life did not receive Amato's request that the

FlexBill be discontinued until September 2001.  We conclude that Plaintiff did not "convert" his

Policies.  ERISA's broad statutory language and the weight of authority favoring ERISA

preemption lead us to conclude that the ID Policies are governed by ERISA, even after Plaintiff

paid his own premiums.  *See Miller v. Provident Life & Accident Ins. Co.*, Case No. 99-9464,

2000 U.S. Dist. LEXIS 14694, at *14 (C.D. Cal. Sept. 5, 2000) (reaching same conclusion); *see

also Mass. Cas. Ins. Co. v. Reynolds*, 113 F.3d 1450, 1453 (6th Cir. 1997) (individual disability

policy still governed by ERISA after employee left partnership and made premium payments

himself, where premium was no longer discounted but policy otherwise not affected).

        **D.**    **Preemption of ERISA Claim**

      ERISA's preemption clause provides that ERISA supersedes "all State laws insofar as

they may now or hereafter relate to any employee benefit plan," except for those State laws that

specifically "regulate insurance."  29 U.S.C. §§ 1144(a), 1144(b)(2)(A).  The Supreme Court has

interpreted ERISA's preemption doctrine broadly.  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41,

107 (1987).  Furthermore, courts in this district have consistently found that the state claims

asserted by Plaintiff are preempted by ERISA.  *See Miller v. Aetna Healthcare*, Civ. A. No.

01-2443, 2001 WL 1609681, at *1 (E.D. Pa. Dec. 12, 2001) (preempting claims for breach of

contract, violations of the UTPCPL and Pennsylvania's bad faith statute because they alleged

that benefits were due under an employee benefits contract that was covered by ERISA); *see also La Fata v. Raytheon Co.*, 223 F. Supp. 2d 668, 676 (E.D. Pa. 2002) (ERISA preempts "state law claims for breach of contract, breach of fiduciary duty, unjust enrichment and breach of covenant of good faith and fair dealing" related to denial of severance benefit); *Clancy v. Unum Life Ins. Co. of Am.*, Civ. A. No. 96-1053, 1996 WL 543929 (E.D. Pa. Sept. 24, 1996) (preempting Pennsylvania state law claims under the UTPCPL, the bad faith statute, and common law breach of duty of good faith and fair dealing because those claims "related to" an employee benefit plan and because Pennsylvania's UTPCPL and bad faith statute do not "regulate insurance").  Here, Plaintiff's state law claims make allegations that "relate to" his benefits under his employee benefit plan, and, therefore, are preempted by ERISA.  Accordingly, Plaintiff's state law claims will be dismissed.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALAN TANNENBAUM, M.D.    :
                   :         CIVIL ACTION
                   :
       v.             :
                   :
                   :
UNUM LIFE INSURANCE   :        NO. 03-CV-1410
COMPANY OF AMERICA, et al.  :

## **ORDER**

AND NOW, this 15th day of September, 2006, upon consideration of Motion of

Defendants Unum Life Insurance Company of America and UnumProvident Corporation For

Dismissal And/Or Partial Summary Judgment (Doc. No. 34), it is ORDERED that the Motion

For Partial Summary Judgment is GRANTED.  Counts IV, V, VI, and VII of Plaintiff's Third

Amended Complaint (Doc. No. 32) are DISMISSED, and the jury demand is STRICKEN.

     IT IS SO ORDERED.

                                 BY THE COURT:

                                 /s/ R. Barclay Surrick
                                 U.S. District Court Judge